[No. E031035. Fourth Dist., Div. Two. May 19, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
LORAN L. LEWIS et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III.B. and C.

---

**COUNSEL**

Conrad Petermann, under appointment by the Court of Appeal, for Defendant and Appellant Tyrone Murphy.

Patrick J. Hennessey, Jr., under appointment by the Court of Appeal, for Defendant and Appellant Loran L. Lewis.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Lilia Garcia and Stacy A. Tyler, Deputy Attorneys General, for Plaintiff and Respondent.

---

**OPINION**

**KING, J.—**

## I.

## INTRODUCTION

Defendants and appellants Loran L. Lewis and Tyrone Murphy were in a stolen car involved in a police pursuit. They crashed the car into another vehicle, killing the occupants of the second vehicle. Defendants were convicted of, among other charges, second degree felony murder for each of the two deaths. The first time they appealed, they argued that the convictions of second degree felony murder must be reversed because the predicate felony, violating Vehicle Code section 2800.2,[1] was not an inherently dangerous

---

[1] All further statutory references are to the Vehicle Code unless otherwise indicated.

felony. This court held that section 2800.2 was an inherently dangerous felony and affirmed the second degree murder convictions.

Thereafter, the California Supreme Court decided *People v. Howard* (2005) 34 Cal.4th 1129 [23 Cal.Rptr.3d 306, 104 P.3d 107] (*Howard*), in which it determined that section 2800.2 was not an inherently dangerous felony, and so could not support a second degree felony-murder conviction. After the California Supreme Court's decision in *Howard*, we recalled the remittitur in this case and vacated our earlier opinion inasmuch as the basis for affirming the convictions had been wholly abrogated.

Following supplemental briefing, we filed an opinion reversing the murder convictions. The People then filed a petition for rehearing. The defendants filed answers to the petition. This court granted the petition, vacating our prior opinion (Cal. Rules of Court, rule 25(d)), and heard additional argument.

Upon reconsidering the matter, we conclude that the murder convictions must be reversed. As before, however, the convictions of the remaining counts are affirmed.

II.

SUMMARY OF FACTS AND PROCEDURAL HISTORY

On a Sunday afternoon a van was stolen from a store parking lot in Rialto, California. The van was abandoned with the engine running in Redlands. A short distance away, a Chevrolet Suburban was stolen outside a residence. The owner of the Suburban saw her car being backed out of the driveway and called police. She described the driver as a Black male, not very large, with short hair.

Redlands police officers heard the dispatch announcement of the theft and, within minutes, spotted the stolen vehicle. Two Black males were inside. The officers began following the Suburban in a commercial area of Redlands. Initially, the driver of the stolen vehicle slowed down as he approached a stop sign, then made a left turn without signaling or stopping. At the next intersection, the Suburban stopped at a red light in the opposing lane of travel; the Suburban then made a right turn, crossing in front of a vehicle stopped at the red light.

The police officers pursued the Suburban onto Interstate 10 at speeds up to 70 miles per hour in medium traffic. The Suburban and the police car slowed as they approached the Tennessee Avenue off-ramp. The stolen car then moved abruptly across three lanes, in front of a big rig truck, and onto the off-ramp. The off-ramp, after crossing Tennessee Avenue, becomes a transition road leading to Alabama Street. The Suburban, traveling westbound on the transition road, entered the intersection of the transition road and Alabama Street against a red light. Traveling at 78 miles per hour, the Suburban collided with a northbound vehicle on Alabama Street. The occupants of that vehicle, Michael and Joan Grizzell, died as a result of the collision.

After the collision, officers saw two Black men get out of the Suburban and run into an open field. The officers chased them on foot and caught them a short distance away.

An eyewitness identified defendant Lewis as the driver of the stolen car; she could not identify defendant Murphy as the passenger. At trial she could no longer identify which defendant had been the driver. A blood sample left inside the stolen car, together with accident reconstruction evidence, indicated that defendant Murphy had been the passenger.

Defendants were convicted of two counts of murder (Pen. Code, § 187), one count of evading an officer in willful disregard of the safety of persons or property (§ 2800.2, subd. (a)), and two counts of unlawful taking or driving of a vehicle (§ 10851, subd. (a)).

In her opening statement to the jury, the prosecutor indicated that the case would be tried on both a felony-murder theory predicated upon violating section 2800.2, and an implied malice theory—that defendants acted with "a conscious disregard for human life." Following the presentation of the People's case-in-chief, and prior to the call for the defense case, the court and counsel discussed and finalized jury instructions. The prosecutor did not request, and the court did not give, any instructions concerning murder based upon a theory of implied malice or that required the jury to find defendants acted with a conscious disregard for human life. The sole theory of murder reflected in the jury instructions was second degree felony murder based upon the predicate offense of violating section 2800.2. After the jury instructions were finalized and the theory of implied malice removed from the case, defendants rested without presenting any witnesses.

The court instructed the jury that an "unlawful killing [of] a human being, whether intentional, unintentional or accidental, which occurs during the commission of the crime of evading a police officer with willful disregard . . . [s]ection 2800.2, is murder of the second degree when the perpetrator had the

specific intent to commit that crime." The jury was further instructed that a violation of subdivision (a) of section 2800.2 required the "specific intent to evade" a pursuing peace officer, and proof that the defendant, while fleeing or attempting to evade a peace officer,[2] "drives the pursued vehicle in a willful or wanton disregard for the safety of persons or property."

Pursuant to subdivision (b) of section 2800.2, the court defined a "willful and wanton disregard for the safety of persons or property" to include "driving while fleeing or attempting to elude a pursuing peace officer during which time the person driving violates three or more [of certain enumerated] Vehicle Code [s]ections," or if property damage occurs. At the prosecutor's request, the court enumerated for the jury the following possible Vehicle Code sections: "One; Right side of roadway, Vehicle Code [s]ection 21650, [¶] Two; Red light, Vehicle Code [s]ection 21453[, subdivision] (a), [¶] Three; Failure to yield right of way, Vehicle Code [s]ection 21800[, subdivision] (a), [¶] Four; Unsafe turning movement, Vehicle Code [s]ection 22107, [¶] Five; Unsafe lane change, Vehicle Code [s]ection 21658, [subdivision (a)], [¶] Six; Passing without sufficient clearance, Vehicle Code [s]ection 21751, [¶] Seven; Speeding, Vehicle Code [s]ection 22350, [¶] or damage to property occurs."

"Willful or wanton" was defined for the jury as "an act or acts intentionally performed with a conscious disregard for the safety of persons or property. It does not necessarily include an intent to injure." In the written instructions given to the jury, this last sentence was underlined.

During closing argument, the prosecutor focused the jury on its ability to find the requisite willful and wanton disregard for the safety of persons or property by finding violations of three Vehicle Code sections pursuant to subdivision (b) of section 2800.2.

The jury found the defendants guilty of both counts of murder.[3]

---

[2] The crime of evading a peace officer in violation of section 2800.1, a misdemeanor, is a predicate offense to violation of section 2800.2, a felony. The predicate offense was defined to include the elements of:

"1. The peace officer's motor vehicle is exhibiting at least one lighted red lamp . . . and the person either sees or reasonably should have seen the lamp.

"2. The peace officer's motor vehicle is sounding a siren . . . .

"3. The peace officer's motor vehicle is distinctively marked.

"4. The peace officer's motor vehicle is operated by a peace officer . . . wearing a distinctive uniform." (§ 2800.1, subd. (a).)

[3] The jury also found defendants guilty of the counts of evading an officer in willful disregard of the safety of persons or property (§ 2800.2, subd. (a)), and unlawful taking or driving of a vehicle (§ 10851, subd. (a)).

## III.

## ANALYSIS

### A. *The Instructional Errors on the Murder Charges Were Prejudicial*

■ "Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (Pen. Code, § 187, subd. (a); *People v. Hansen* (1994) 9 Cal.4th 300, 307 [36 Cal.Rptr.2d 609, 885 P.2d 1022].) Second degree murder is the unlawful killing of a human being with malice aforethought, but without the elements, such as willfulness, deliberation, and premeditation, or the commission of certain enumerated felonies, that would support a conviction of first degree murder. (*People v. Robertson* (2004) 34 Cal.4th 156, 164 [17 Cal.Rptr.3d 604, 95 P.3d 872].) Malice may be express or implied. (*Ibid.*) "Malice is express 'when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.' ([Pen. Code,] § 188.) It is implied 'when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.' (*Ibid.*) More specifically, 'malice is implied "when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." [Citation.]' [Citation.]" (*Ibid.*)[4]

■ The court-created second degree felony-murder rule acts as a substitute for the mental component of malice. (*Howard, supra,* 34 Cal.4th at p. 1135; *People v. Patterson* (1989) 49 Cal.3d 615, 626 [262 Cal.Rptr. 195, 778 P.2d 549].) Under this rule, a homicide that results from the commission of a felony that is inherently dangerous to human life (other than the felonies enumerated in Penal Code section 189 to support first degree murder) is second degree murder. (*Howard, supra,* at p. 1135.) An " 'inherently dangerous felony' is an offense carrying 'a high probability' that death will result." (*People v. Patterson, supra,* at p. 627.) When the felony-murder rule applies, " 'the only criminal intent required is the specific intent to commit the particular felony.' [Citation.]" (*People v. Dillon* (1983) 34 Cal.3d 441, 475 [194 Cal.Rptr. 390, 668 P.2d 697].)

---

[4] The Supreme Court has granted review in *People v. Noel* (2005) 128 Cal.App.4th 1391 [28 Cal.Rptr.3d 369], review granted July 27, 2005, S134543, to address the issue of whether the mental state required for implied malice includes only conscious disregard for human life or is satisfied by an awareness that the act is likely to result in great bodily injury.

Here, the only theory of murder upon which the jury was instructed, the only theory in the case at the time the defense was called to present evidence, and the only theory argued by the prosecutor in closing argument, was second degree felony murder based upon defendants' violation of section 2800.2.

■ Section 2800.2, subdivision (a), makes it a crime to drive a vehicle with willful or wanton disregard for the safety of persons or property while fleeing or attempting to elude a pursuing peace officer. Subdivision (b) of that section provides: "For purposes of this section, a willful or wanton disregard for the safety of persons or property includes, but is not limited to, driving while fleeing or attempting to elude a pursuing peace officer during which time either three or more violations that are assigned a traffic violation point count under [s]ection 12810 occur, or damage to property occurs."

■ In *Howard*, the California Supreme Court held that violating section 2800.2 is not, in the abstract, "inherently dangerous to human life" and therefore cannot support a conviction for murder under the second degree felony-murder rule. (*Howard, supra*, 34 Cal.4th at pp. 1137–1139.) This holding was based primarily on the inclusion within section 2800.2 of subdivision (b). This subdivision, the court stated, "very broadly defines the term 'willful or wanton disregard for the safety of persons or property,' as used in subdivision (a), to include *any* flight from an officer during which the motorist commits three traffic violations that are assigned a 'point count' under section 12810, or which results in 'damage to property.' " (*Howard, supra*, at p. 1137.) Violations of section 2800.2, the court explained, can be committed without endangering human life.[5] (*Howard, supra*, at p. 1137.) Therefore, violating that section "is not, in the abstract, inherently dangerous to human life [and] the second degree felony-murder rule does not apply when a killing occurs during a violation of section 2800.2." (*Id.* at pp. 1138–1139.)

The *Howard* court concluded by directing the Court of Appeal in that case to consider on remand whether the court's instructions as to felony murder were prejudicial. (*Howard, supra*, 34 Cal.4th at p. 1139.) As noted *ante*, we recalled the remittitur in this case to consider whether the errors were prejudicial.

---

[5] The court cited the following as examples of traffic violations for which points are assigned under section 12810: "driving an unregistered vehicle owned by the driver (§§ 40001, 12810, subds. (e), (g)(1)), driving with a suspended license (§§ 14601, 12810, subd. (i)), driving on a highway at slightly more than 55 miles per hour when a higher speed limit has not been posted (§§ 22349, subd. (a), 12810, subd. (e)), failing to come to a complete stop at a stop sign (§§ 22450, 12810, subd. (e)), and making a right turn without signaling for 100 feet before turning (§§ 22108, 12810, subd. (e))." (*Howard, supra*, 34 Cal.4th at pp. 1137–1138.)

█ In light of *Howard*, the trial court's failure to instruct the jury on the implied malice theory of murder and the giving of instructions on the legally incorrect theory of felony murder constituted error—a point no longer disputed by the People.[6] By relieving the prosecutor of the burden of proving the elements of murder beyond a reasonable doubt and depriving defendants of a jury trial on a valid theory of murder, these errors contravene both the United States and California Constitutions. (See *United States v. Gaudin* (1995) 515 U.S. 506, 509–510 [132 L.Ed.2d 444, 115 S.Ct. 2310]; *People v. Flood* (1998) 18 Cal.4th 470, 479–480 [76 Cal.Rptr.2d 180, 957 P.2d 869] (*Flood*).) To the extent the error implicates federal constitutional rights, our inquiry is governed by the harmless error standard expressed in *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824] (*Chapman*). When such error consists of a failure to instruct on an element of a charge or amounts to an instruction of a legally incorrect theory, the judgment must be reversed unless the People prove beyond a reasonable doubt that the error did not contribute to the verdict in the case at hand; one way to meet this burden is to show from the verdicts that the jury necessarily found all the elements required to convict under a proper theory. (*Id.* at p. 24; *Yates v. Evatt* (1991) 500 U.S. 391 [114 L.Ed.2d 432, 111 S.Ct. 1184] (*Yates*), disapproved on another point in *Estelle v. McGuire* (1991) 502 U.S. 62, 73, fn. 4 [116 L.Ed.2d 385, 112 S.Ct. 475]; *Calderon, supra*, 129 Cal.App.4th at pp. 1306–1307; *Keating v. Hood* (9th Cir. 1999) 191 F.3d 1053, 1062, overruled on another ground in *Mancuso v. Olivarez* (9th Cir. 2002) 292 F.3d 939, 944, fn. 1; cf. *People v. Perez* (2005) 35 Cal.4th 1219, 1233 [29 Cal.Rptr.3d 423, 113 P.3d 100].)

The People contend that the instructional errors in this case were harmless because "any reasonable jury would have found the elements of implied malice second degree murder." As we explain, this misstates the applicable harmless error standard. In *Chapman, supra*, 386 U.S. 18, the prosecution commented on the defendants' refusal to testify at trial and the court instructed the jury that it could draw adverse inferences from such refusal.

---

[6] The two errors—failure to instruct on a legally correct theory and the giving of instructions on a legally incorrect theory—do not necessarily occur together. The court could have, of course, instructed the jury as to the valid theory of implied malice as well as the invalid theory of felony murder. If it had done so, our inquiry would be limited to determining whether there the record shows that the verdict was actually based on the legally correct theory. (See, e.g., *People v. Guiton* (1993) 4 Cal.4th 1116, 1130 [17 Cal.Rptr.2d 365, 847 P.2d 45]; *People v. Calderon* (2005) 129 Cal.App.4th 1301, 1307 [29 Cal.Rptr.3d 277] (*Calderon*).) Here, however, the court's instructing on the invalid theory, without also instructing on a legally correct theory, compounds the court's error.

That practice was subsequently declared unconstitutional in *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]. The California Supreme Court found that the violation of the federal Constitution was harmless under the "miscarriage of justice" standard set forth in California's Constitution. (See Cal. Const., art. VI, § 13.) The United States Supreme Court reversed, holding that federal law governs the standard for harmless error when the error results in the violation of federal constitutional rights. (*Chapman, supra,* at p. 21.)

Next, the *Chapman* court considered the nature of the federal standard for harmless error. The court indicated its disapproval of California's constitutional harmless error standard when applied to violations of federal constitutional rights. California's constitutional rule requiring affirmance in the absence of a miscarriage of justice, the court stated, has been "neutralized" by California courts "to some extent by emphasis, and perhaps overemphasis, upon the court's view of 'overwhelming evidence.' " (*Chapman, supra,* 386 U.S. at p. 23.) The high court contrasted the California courts' reliance on "overwhelming evidence" to determine prejudice with the approach used in *Fahy v. Connecticut* (1963) 375 U.S. 85 [11 L.Ed.2d 171, 84 S.Ct. 229]. The *Fahy* harmless error inquiry, the court stated, " 'is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' " (*Chapman, supra,* at p. 23, quoting *Fahy v. Connecticut, supra,* at pp. 86–87.) This inquiry, the court explained, is essentially identical to requiring, as the *Chapman* court declared, that the beneficiary of a constitutional error must prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. (*Chapman, supra,* at p. 24.)

The nature of the *Chapman* harmless error inquiry was clarified in *Yates,* and addressed in *Sullivan v. Louisiana* (1993) 508 U.S. 275 [124 L.Ed.2d 182, 113 S.Ct. 2078] (*Sullivan*). In *Yates,* the trial court instructed the jury in a murder trial, in which malice was an element of the crime, that it could presume the defendant acted with malice if certain predicate facts were found. The defendant was convicted, and the South Carolina Supreme Court held that the instruction was unconstitutional but that the error was harmless. The United States Supreme Court concluded that the error was not harmless. The court explained that the South Carolina Supreme Court erred in applying *Chapman* when it "sought merely to determine whether it was beyond a reasonable doubt that the jury 'would have found it unnecessary to rely' on the unconstitutional presumptions." (*Yates, supra,* 500 U.S. at p. 406.) The

harmless error inquiry, the court explained, is not directed at what a reviewing court believes a jury *would have done in the absence of the error*, but on whether *the jury's verdict actually rested* on evidence establishing the presumed fact beyond a reasonable doubt, independently of the presumption. (*Id.* at p. 404.)

The *Yates* court expressly disapproved of language in an earlier decision, *Rose v. Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101] (overruled on other grounds in *Brecht v. Abrahamson* (1993) 507 U.S. 619, 637 [123 L.Ed.2d 353, 113 S.Ct. 1710]), in which the court stated, "Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed." (*Id.* at p. 579.) The *Yates* court made clear that this aspect of *Rose v. Clark*, read in isolation, is not correct. (*Yates, supra,* 500 U.S. at p. 403, fn. 8.)

One other aspect of *Yates* is instructive here. In applying the harmless error analysis to the facts, the court found that there was "clear evidence" that the defendant's accomplice intended to kill a shopkeeper during the course of a robbery. (*Yates, supra,* 500 U.S. at p. 409.) Instead of killing the shopkeeper, however, the accomplice killed the shopkeeper's mother. As to the mother, there was nothing in the instructions that allowed the jurors to consider the evidence of the intent to kill the shopkeeper in assessing the accomplice's intent to kill the mother. The Supreme Court noted that the theory of transferred intent would have permitted the jury to equate the intent to kill the shopkeeper with malice as to the mother. However, "the jury was not charged on a theory of transferred intent, and [the court is] therefore barred from treating evidence of intent to kill [the shopkeeper] as underlying the necessary finding of intent to kill [the shopkeeper's] mother." (*Ibid.*) Thus, even though there may be sufficient evidence to support a conviction on a theory not presented to the jury, because the theory was not presented to the jury, a reviewing court is barred from determining that the error is harmless.

■ In *Sullivan*, the court considered whether an erroneous reasonable doubt instruction was subject to harmless error analysis. In language that is directly contrary to the People's proposed harmless error inquiry, the Supreme Court stated that "the question [*Chapman*] instructs the reviewing court to consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand. [Citation.] Harmless-error review looks . . . to the basis on which 'the jury *actually rested* its verdict.'

[Citation.] The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee." (*Sullivan, supra,* 508 U.S. at p. 279; see also *People v. Kobrin* (1995) 11 Cal.4th 416, 429–430 [45 Cal.Rptr.2d 895, 903 P.2d 1027].)[7] The right to a jury trial, the court concluded, "requires more than appellate speculation about a hypothetical jury's action, or else directed verdicts for the State would be sustainable on appeal . . . ." (*Sullivan, supra,* at p. 280.)

Under *Chapman, Yates,* and *Sullivan,* the harmless error inquiry is directed at determining whether the error actually contributed to the jury's verdict at hand. The test is not whether a hypothetical jury, no matter how reasonable or rational, would render the same verdict in the absence of the error, but whether there is any reasonable possibility that the error might have contributed to the conviction in this case. If such a possibility exists, reversal is required. The test for harmless error suggested by the People in the present case—whether "any reasonable jury would have found the elements of implied malice second degree murder"—is patently incompatible with this standard.

Taken in context, *Neder v. United States* (1999) 527 U.S. 1 [144 L.Ed.2d 35, 119 S.Ct. 1827] (*Neder*) and *Flood, supra,* 18 Cal.4th 470, are not inconsistent. In *Neder,* the United States Supreme Court considered whether the failure to instruct the jury on an element of a crime is subject to harmless error analysis. In that case, the defendant was convicted of, among other crimes, filing false income tax returns that underreported $5 million in income. An element of this crime is that false statements made by the defendant are "material." (26 U.S.C.A. § 7206(1).) The defendant did not argue at trial or on appeal that the false statements at issue were not material. (*Neder, supra,* at p. 16.) Outside the presence of the jury, the court found that the evidence established the element of the materiality and instructed the jury that the question of the materiality " 'is not a question for the jury to decide.' " (*Id.* at p. 6.)

The *Neder* court determined that the error was subject to harmless error analysis and, under the circumstances presented in that case, was harmless. In distinguishing *Sullivan,* the court explained: "The omitted element [in *Neder*] was materiality. [Neder] underreported $5 million on his tax returns, and did not contest the element of materiality at trial. [Neder] does not suggest that he

---

[7] The *Sullivan* court ultimately held that the instructional error in that case was structural and not subject to harmless error analysis. (*Sullivan, supra,* 508 U.S. at pp. 281–282.)

would introduce any evidence bearing upon the issue of materiality if so allowed. Reversal *without any consideration of the effect of the error upon the verdict* would send the case back for retrial—a retrial not focused at all on the issue of materiality, but on contested issues on which the jury was properly instructed. We do not think the Sixth Amendment requires us to veer away from settled precedent to reach such a result." (*Neder, supra,* 527 U.S. at p. 15, italics added.)

Justice Stevens, in a concurring opinion, stated that the failure to instruct the jury as to materiality was harmless because, based upon other jury findings implicit in the verdict, the verdict "necessarily included a finding" on the issue of materiality. (*Neder, supra,* 527 U.S. at p. 26 (conc. opn. of Stevens, J.).) According to Justice Stevens, there is "a distinction of true importance between a harmless-error test that focuses on what the jury did decide, rather than on what appellate judges think the jury would have decided if given an opportunity to pass on an issue." (*Id.* at p. 27 (conc. opn. of Stevens, J.).) Harmless error analysis, he explained, " 'may enable a court to remove a taint from proceedings in order to *preserve* a jury's findings, but it cannot constitutionally *supplement* those findings.' [Citation.]" (*Ibid.*)

Justice Scalia, in an opinion joined by Justices Souter and Ginsburg, dissented. Justice Scalia pointed out that under *Sullivan* and *Yates,* "[t]he failure of the court to instruct the jury properly—whether by omitting an element of the offense or by so misdescribing it that it is effectively removed from the jury's consideration—*can* be harmless, if the elements of guilt that the jury *did* find necessarily embraced the one omitted or misdescribed." (*Neder, supra,* 527 U.S. at p. 35 (dis. opn. of Scalia, J.).) The dissent expressed concern that the majority was "casting *Sullivan* aside" and "throw-[ing] open the gate for appellate courts to trample over the jury's function." (*Id.* at p. 36 (dis. opn. of Scalia, J.).)

The *Neder* majority made it clear, however, that it was not disturbing the focus in *Chapman, Yates,* and *Sullivan* on the question of whether the error contributed to the jury's verdict, and that its formulation of the harmless error inquiry was to be applied only in a "narrow class of cases like the present one." (*Neder, supra,* 527 U.S. at p. 17, fn. 2.) The court explained: "In a case such as this one, *where a defendant did not, and apparently could not, bring forth facts contesting the omitted element,* answering the question whether the jury verdict would have been the same absent the error does not fundamentally undermine the purposes of the jury trial guarantee. [¶] Of course, safeguarding the jury guarantee will often require that a reviewing court conduct a thorough examination of the record. If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error . . . it should not find the error harmless." (*Id.* at p. 19, italics added.)

One year prior to *Neder*, the California Supreme Court addressed the harmless error standard in an omitted element case in *Flood*. *Flood* involved an instructional error concerning a charge of evading a pursuing peace officer under section 2800.3. An element of that crime is that the person driving the pursuing vehicle is a peace officer. (*Flood, supra*, 18 Cal.4th at p. 475.) The trial court, however, failed to instruct the jury that it should determine this issue; rather, it "informed the jury—in conformity with the uncontradicted evidence that had been presented at trial—that the police officers in that vehicle were peace officers, thus effectively removing this element of the crime from the jury's consideration." (*Ibid.*) The California Supreme Court considered whether the error of failing to instruct on this element was subject to harmless error analysis and, if so, whether under the facts presented the error was harmless.

■ Following a review of United States Supreme Court precedent in this area, the *Flood* court concluded "that an instructional error that improperly describes or omits an element of an offense, or that raises an improper presumption or directs a finding or a partial verdict upon a particular element, generally is not a structural defect in the trial mechanism that defies harmless error review and automatically requires reversal under the federal Constitution." (*Flood, supra*, 18 Cal.4th at pp. 502–503.)[8] The court further concluded that the failure to instruct as to the peace officer element of section 2800.3 was harmless because "the record establishe[d] beyond a reasonable doubt that the trial court's instructional error on the peripheral peace officer issue *did not contribute to the jury's guilty verdict* . . . ." (*Flood, supra*, at p. 505, italics added.) The court based this conclusion on the following: (1) the defendant effectively conceded the issue by failing to object to the instruction, presenting no evidence regarding the peace officer element, and failing to dispute the prosecution's evidence on the issue; (2) the actual verdict rendered demonstrated that the jury found that the two persons in the car pursuing defendant wore "distinctive" uniforms and were driving a "distinctively marked" vehicle; (3) because the peace officer requirement is an expressly enumerated element of the crime, defendant could not contend

---

[8] In addition to discussing *Yates* and *Sullivan*, the *Flood* court relied on *California v. Roy* (1996) 519 U.S. 2 [136 L.Ed.2d 266, 117 S.Ct. 337]. *Roy* was before the Ninth Circuit Court of Appeals on review of a denial of a petition for habeas corpus. The trial court in the underlying California state case erroneously failed to instruct the jury regarding the intent required for aiding and abetting liability—an error that would have been subject to *Chapman* harmless error analysis on direct appeal. According to the Ninth Circuit, a court considering a collateral attack could find that a state trial court's failure to instruct as to an element of the crime was " 'harmless only if review of the facts found by the jury establishes that the jury *necessarily* found the omitted element.' [Citation.]" (*California v. Roy, supra*, at p. 4.) The Supreme Court reversed, holding that the proper harmless error inquiry under these circumstances is " 'whether the error "had substantial and injurious effect or influence in determining the jury's verdict." ' [Citation.]" (*Id.* at pp. 5–6.)

that he lacked notice or did not have a full opportunity to present any evidence on the issue; (4) "*all* of the evidence at trial relevant to the issue in question indicated that [the officers in the pursuing vehicle] were peace officers"; (5) the "misinstruction [was] on a peripheral issue that was never actually in dispute at trial"; and (6) the missing element "had nothing to do with defendant's own actions or mental state." (*Id.* at pp. 504–507.) Under such circumstances, the court concluded, "there is no possibility that the error affected the result." (*Id.* at p. 507.)

The failure to instruct on a theory of malice in the case before us, however, cannot be reasonably analogized to the uncontested element of materiality in *Neder* or the peripheral missing peace officer element in *Flood*. In both those cases, the particular issues were not only uncontested and indisputable, but had nothing to do with defendant's actions or mental state. Moreover, the factual truth of the omitted element was implicitly found by the jury as disclosed by the verdict and other instructions. (*Neder, supra,* 527 U.S. at p. 26 (conc. opn. of Stevens, J.); *Flood, supra,* 18 Cal.4th at p. 505.) Here, the theory of implied malice is focused squarely on defendant's actions and mental state, and cannot be described as a peripheral issue in a murder charge. Nor, as discussed *post*, was malice implicitly found by the jury in this case.

There can be no doubt that the improper jury instructions on murder actually contributed to the murder verdicts obtained in this case. Indeed, on the murder charges, the jury was instructed *solely* on the invalid theory of murder; there was no other possible basis upon which the jury could have rested its verdict. Moreover, the prosecutor, in her closing argument, strongly emphasized the jury's ability to use the violation of section 2800.2 as the basis for determining whether to convict defendants of murder. She argued: "But when we get into Count 3, [evading a police officer], Count 3 is going to be your basis for deciding, first of all, Count 3, and then deciding Counts 1 and 2 [murder]. . . . [¶] . . . [¶] . . . And all this means is . . . the safety of persons or property includes driving while fleeing or attempting to elude a pursuing peace officer during which time the person violates three or more— and, again . . . Vehicle Code [s]ections. [¶] And your Vehicle Code [s]ections are things that you're stopped for, you know, speeding, running a red light, those kinds of the [*sic*] things. And that's why you heard the officers testify about the different violations that were occurring during a pursuit, is because they have to go into that particular section and discuss it. [¶] You've been given, in this particular instruction, and elsewhere where [*sic*] in your instructions—actually, seven. I've listed seven for you. There's more. There's more than seven. More than seven were discussed. This only calls for three, but it gives you something to choose from." Later, the prosecutor explained: "There's two degrees of murder in our State of California. Typically jurors—

juries are deciding first degree murder cases or having to discuss premeditation and all these other malice aforethought terms, second degree murder. *You also, typically, have a—an element, malice aforethought. Not in this case. Because in this case we've made it very simple for you. And it's basically what I would call a no-brainer. Because your theory under second degree murder in this case is you have a felony evading a police officer with wanton and willful disregard that the Legislature has determined to be inherently dangerous.*" (Italics added.) The prosecutor concluded: "Counts 1 and 2, actually, are going to stem out of your discussions on Count 3. So Counts 1, 2 and 3 are very much together. If you find them guilty of Count 3, the felony, you sign those verdict forms for Count[s] 1 and 2."

There is nothing in the record that suggests that the jury did not follow the erroneous instructions and the "no-brainer" theory of murder urged by the prosecutor. In light of the absence of instructions as to a valid theory of murder and the prosecutor's emphasis, it is clear that the erroneous instructions contributed to the verdict in this case.

█ Here, the court not only omitted any instruction on the element of malice, but actually instructed the jury that it could find defendant guilty of murder based upon a legally invalid theory. Under federal or California law, a legally incorrect theory, if relied upon by the jury, cannot as a matter of law validly support a conviction. (*Yates v. United States* (1957) 354 U.S. 298, 312 [1 L.Ed.2d 1356, 77 S.Ct. 1064], overruled on other grounds in *Burks v. United States* (1978) 437 U.S. 1 [57 L.Ed.2d 1, 98 S.Ct. 2141]; *People v. Green* (1980) 27 Cal.3d 1, 69 [164 Cal.Rptr. 1, 609 P.2d 468], disapproved on another point in *People v. Hall* (1986) 41 Cal.3d 826, 834, fn. 3 [226 Cal.Rptr. 112, 718 P.2d 99]; *Calderon, supra,* 129 Cal.App.4th at pp. 1306–1307 & fn. 5.) When the verdict is based upon a legally invalid theory, "reversal generally is required unless 'it is possible to determine from other portions of the verdict that the jury necessarily found the defendant guilty on a proper theory.' " (*People v. Perez, supra,* 35 Cal.4th at p. 1233, quoting *People v. Guiton, supra,* 4 Cal.4th at p. 1130; see also *Keating v. Hood, supra,* 191 F.3d at p. 1062 [reversal is required unless it is *absolutely certain* that the jury relied upon a legally correct theory to convict].)

Here, if the jury finding of willful and wanton disregard for the safety of persons or property necessarily implied a finding of malice, then the error could be deemed harmless. *Calderon, supra,* 129 Cal.App.4th 1301, is instructive on this point. In that case, Jose Calderon was the driver of a stolen PT Cruiser. He failed to yield to a deputy sheriff's sirens and a chase ensued. (*Id.* at p. 1305.) While attempting to evade the deputy, Calderon crossed into an oncoming traffic lane and hit another vehicle, killing the driver of the other vehicle. (*Id.* at pp. 1305–1306.) In addition to instructing the jury as to

murder based upon implied malice, the court instructed the jury: " 'The unlawful killing of a human being whether intentional or unintentional or accidental which occurs in the commission of the crime of a violation of . . . [s]ection 2800.2[, subdivision] (a), felony fleeing of peace officer in willful or wanton disregard for the safety of persons, is murder of the second degree when the perpetrator had the specific intent to commit the crime. And that specific intent must be proved beyond a reasonable doubt.' " (*Id.* at p. 1308.) In contrast to the instructions given to the jury here, the *Calderon* jury was not instructed that "willful and wanton disregard for the safety of persons or property" could be shown by the occurrence of three traffic violations, as provided in subdivision (b) of section 2800.2. (*Calderon, supra,* at p. 1309.) Calderon was convicted of murder upon a general verdict.

On appeal in *Calderon*, the People conceded that the felony-murder instruction was error in light of *Howard*, but argued that if the jurors based their conviction on the felony-murder instructions, they necessarily also found implied malice for purposes of murder. (*Calderon, supra,* 129 Cal.App.4th at pp. 1307–1308.) The Court of Appeal was therefore faced with the question "whether 'willful or wanton disregard for the safety of persons' is the equivalent of 'conscious disregard for human life.' " (*Id.* at p. 1308.) The court concluded that "the two are not the same." (*Ibid.*) The court explained: "In our view, there is a subtle but . . . inescapable, difference between disregard for the *safety* of persons and disregard for human *life*. An act is dangerous to life, for purposes of implied malice, when there is a high probability it will result in death. [Citations.] Such an act is required before implied malice may be found. [Citations.] Yet an act may endanger a person's safety without carrying such a risk. Moreover, a disregard for safety may encompass a disregard for life, but it need not do so. A person might be willing to risk causing minor injuries while attempting to evade police, yet might very well not be willing to risk causing serious injury or death. [¶] That the requisite mental states involve disregard of differing threshold levels of risk is implicit in the provisos contained in the respective instructions. Thus, CALJIC No. 8.31 (second degree murder—killing resulting from unlawful act dangerous to life) tells jurors that the defendant need not have intended that his or her act would result in *death*. CALJIC No. 12.85 (flight from pursuing peace officer—reckless driving) tells jurors that 'willful or wanton' need not include an intent to *injure*. This distinction was contained in the instructions given here. Drawing such a distinction is also consistent with the purpose behind section 2800.2, which is to deter drivers from fleeing peace officers. [Citation.] The Legislature reasonably could seek to deter flight posing a risk of injury, not just that posing a risk of serious bodily harm or death." (*Id.* at p. 1310, fn. omitted.) Based upon this analysis, the Court of Appeal reversed.

 *Calderon*'s rationale applies with even greater force here. In *Calderon*, the jury was instructed, pursuant to subdivision (a) of section

2800.2, that it could find the predicate felony if (among other elements) it found that the defendant acted with willful or wanton disregard for the safety of persons. Here, unlike *Calderon*, the jury was further instructed, under subdivision (b) of section 2800.2, that it could find willful and wanton disregard for safety of persons or property by merely finding that the defendants committed three enumerated traffic violations. Indeed, as shown by the prosecutor's closing argument, the jury could have taken, and probably did take, the "no-brainer" approach and convicted defendants of murder based upon the occurrence of three traffic violations while evading peace officers (with the intent to evade the officers). Committing three traffic violations under such circumstances does not, of course, equate to an implicit finding that defendants acted with "a conscious disregard for human life." In light of the inclusion of the instructions based upon subdivision (b) of section 2800.2, the difference between the instructions given in this case and instructions based upon implied malice is substantially greater than the "subtle" difference at issue in *Calderon*.[9]

Because the court's instructional errors contributed to the jury's verdicts and there is no basis for concluding from the jury's verdict that the jury necessarily found the defendants acted with conscious disregard for human life, the instructional errors relative to the legally invalid theory were prejudicial and the convictions cannot stand.

In support of their argument, the People rely mainly on Justice Baxter's dissent in *Howard, supra,* 34 Cal.4th at pages 1141 through 1148. In doing so, the People extend Justice Baxter's analysis beyond its limits.

In *Howard*, the California Supreme Court remanded the case to the Court of Appeal to consider whether the instructional error in that case was harmless. (*Howard, supra,* 34 Cal.4th at p. 1139.) In a footnote, the majority stated: "Justice Baxter's dissenting opinion argues forcefully that the trial court's instructional error was harmless because (1) there was overwhelming evidence that defendant acted with implied malice, *and* (2) *the jury implicitly found, based on the trial court's instructions, that defendant acted with malice.*" (*Id.* at p. 1139, fn. 4, italics added.)

---

[9] An additional fact that makes *Calderon* a closer case than here is that the instructions in *Calderon* limited the definition of the unlawful conduct to evading a peace officer in willful or wanton disregard for the safety of *persons*. Here, the instructions extended the culpable conduct to willful or wanton disregard for the safety of either persons "or property." Although the additional words "or property" are appropriate for instructing the jury on the charge of violating section 2800.2, its inclusion permitted a conviction for murder even if the jury did not find defendant acted with disregard for the safety of persons so long as the defendant acted with a willful or wanton disregard for the safety of property. If, as the *Calderon* court concluded, acting with willful or wanton disregard for the safety of persons is not equivalent to acting with conscious disregard for human life, then acting with willful or wanton disregard for the safety of property cannot equate to conscious disregard for human life.

In *Howard*, the jury was instructed on second degree felony murder, with the underlying felony being a violation of section 2800.2. However, the *Howard* jury, unlike here, was instructed only as to the requirement of willful or wanton disregard for the safety of persons or property as provided in subdivision (a) of section 2800.2. In the present matter, the jury was instructed not only as to the language in subdivision (a), but also told, pursuant to subdivision (b) of that section, that the "willful or wanton disregard for safety" could be satisfied if defendants committed three or more traffic violations during the time period they were evading the peace officer. This absence of the subdivision (b) instructions in *Howard* is critical to Justice Baxter's dissent.

Justice Baxter stated: "The prosecution avoided all reliance on subdivision (b) of section 2800.2, and that subdivision was never an issue in the trial below. . . . [¶] In his argument to the jury concerning section 2800.2, the prosecutor emphasized that defendant's various reckless traffic violations proved he had acted with 'willful or wanton disregard,' i.e., with *conscious indifference* to the consequences for safety. The entire focus of the prosecutor's argument was on defendant's culpable state of mind while fleeing the police, as evidenced by his inherently dangerous driving maneuvers. The prosecutor never suggested that technical 'points' violations committed by defendant were a basis for finding him guilty of violating section 2800.2, or of murder. [¶] Most crucially, all reference to subdivision (b) was omitted from the jury instruction on section 2800.2. When describing the elements of a violation of the statute, the instruction said only that ' "[w]illful or wanton" means an act intentionally performed *with a conscious disregard for the safety of persons or property.* It does not necessarily include an intent to injure.' (Italics added.) [¶] Thus, beyond doubt, the jury convicted defendant of murder based solely on proof that he fled police pursuit by driving with reckless indifference to safety, conduct which is both inherently dangerous and expressly felonious under subdivision (a) of section 2800.2. . . . [¶] But even if section 2800.2 were not an inherently dangerous felony that could support a felony-murder conviction, any error in instructing the jury to the contrary was harmless. . . . [¶] I find such a conclusion inescapable, for two reasons. First, a reasonable jury, properly instructed on an *implied malice* theory of second degree murder, could not have failed to find, on this evidence, the elements of malicious murder. *Second, though this jury received no explicit instructions on malice, it necessarily did find, under the instructions which were given, that defendant killed maliciously."* (*Howard, supra,* 34 Cal.4th at pp. 1144–1145 (dis. opn. of Baxter, J.), last italics added.)

From Justice Baxter's discussion, it is clear that his application of the harmless error analysis was dependent on his conclusion that the jury's determination of "willful or wanton disregard for safety" necessarily implied a finding of malice.[10] This conclusion was based in large part upon the absence of any reliance by the prosecution on subdivision (b) of section 2800.2. This distinguishes Justice Baxter's dissent from our case.

In this matter, the jury was instructed on subdivision (b) of section 2800.2, which allows a finding of "willful or wanton disregard for safety of persons or property" based upon the commission of three or more traffic violations. And unlike *Howard*, where the prosecutor did not reference subdivision (b), the prosecutor in the present case focused her entire closing argument relative to murder on the fact that defendants committed three or more traffic violations in the process of evading the police officer. Even if we assume that implied malice can be found in a jury determination of willful and wanton disregard for safety of persons or property based upon subdivision (a), such a finding is simply not implicit in a finding that a defendant committed three or more traffic violations.[11]

B., C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[10] This analysis is consistent with the rule, discussed *ante*, that instruction on a legally invalid theory will be harmless when other portions of the verdict show that the jury found the defendant guilty on a proper theory. (See, e.g., *Neder, supra*, 527 U.S. at p. 26 (conc. opn. of Stevens, J.); *Ficklin v. Hatcher* (9th Cir. 1999) 177 F.3d 1147, 1151 [court could "tell with certainty from the jury instructions that the jury rested its verdict on a ground that did not implicate petitioner's constitutional right"]; *People v. Pulido* (1997) 15 Cal.4th 713, 715–716, 726–727 [63 Cal.Rptr.2d 625, 936 P.2d 1235] [factual question posed by omitted instruction was necessarily resolved by other proper instructions].)

[11] Defendants were convicted of murder under a theory in which both the actus reus and mens rea are entirely distinct from murder under an implied malice theory. Under the invalid theory urged by the prosecutor, the acts the People needed to prove were evading a police officer and the violation of three traffic laws. The only mental component necessary for the jury to convict defendants of murder was the intent to evade a police officer. If, however, the jury had been properly instructed, the jury would have been required to find that the defendant engaged in an act, the natural consequences of which were dangerous to human life. They would also have been required to find that defendants had the mental state that the life-threatening act was deliberately performed with the knowledge that they were endangering life and with conscious disregard for life. These differences in theories are so patent that it cannot be said that the jury necessarily found implied malice by returning a guilty verdict.

*See footnote, *ante*, page 874.

## DISPOSITION

The convictions as to counts 3 (felony evading an officer, § 2800.2), 4 and 5 (unlawful taking and driving of a vehicle, § 10851), are affirmed as to both defendants. The convictions as to counts 1 and 2 (second degree murder, Pen. Code, § 187) are reversed as to both defendants.

Richli, Acting P. J., and Gaut, J., concurred.